LATHAM & WATKINS LLP
Melanie M. Blunschi (Bar No. 234264)
 melanie.blunschi@lw.com
Kristin Sheffield-Whitehead (Bar No. 304635)
 kristin.whitehead@lw.com
Catherine A. Rizzoni (Bar No. 322267)
 cat.rizzoni@lw.com
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Margaret A. Upshaw (*pro hac vice*
forthcoming)
 maggie.upshaw@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant*
*Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| A.A. and C.M., individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC.,<br><br>                              Defendant. | Case No.  3:25-cv-08852-JSC<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing: January 22, 2026<br>Time:   10:00 a.m.<br>Location: Courtroom 8—19th Floor<br>Judge: Hon. Jacqueline Scott Corley |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

META'S MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-08852-JSC

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on January 22, 2026 at 10:00 a.m., before the Honorable Jacqueline Scott Corley, United States District Court, Courtroom 8, 19th Floor, 450 Golden Gate Ave., San Francisco, California, Defendant Meta Platforms, Inc. ("Meta") will and hereby does move for an order dismissing Plaintiffs A.A. and C.M.'s ("Plaintiffs'") Class Action Complaint (Dkt. 1-1) for failure to state a claim under Rule 12(b)(6). This motion is based on this notice of motion; the memorandum of points and authorities in support thereof that follows; the proposed order filed concurrently herewith; the request for judicial notice and accompanying declaration; the pleadings, records, and papers on file in this action; oral argument; and any other matters properly before the Court.

## STATEMENT OF ISSUE TO BE DECIDED

Whether the Court should dismiss the Class Action Complaint for failure to state any claim upon which relief can be granted under Rule 12(b)(6).

Dated: October 22, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Melanie M. Blunschi*
Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Kristin Sheffield-Whitehead (Bar No. 304635)
*kristin.whitehead@lw.com*
Catherine A. Rizzoni (Bar No. 322267)
*cat.rizzoni@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Margaret A. Upshaw (*pro hac vice* forthcoming)
*maggie.upshaw@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant*
*Meta Platforms, Inc.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1

META'S MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-08852-JSC

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................. 1

II. BACKGROUND ................................................................................................... 3

    A. The Meta Pixel ......................................................................................... 3

    B. Meta's Terms And Policies....................................................................... 4

        1. Meta's Terms Of Service, Privacy Policy, and Cookies Policy ....................................................................................... 4

        2. Meta's Business Tools Terms.................................................... 5

    C. Wisp's Privacy Policy............................................................................... 6

    D. Plaintiffs' Complaint................................................................................. 7

III. LEGAL STANDARD............................................................................................ 8

IV. ARGUMENT ........................................................................................................ 8

    A. Plaintiffs' Claims Fail Because Plaintiffs Consented To Meta's Receipt Of Data Reflecting Their Activity On Wisp's Website........................... 8

        1. Plaintiffs Consented By Agreeing To Meta's Policies ............ 10

        2. Wisp's Privacy Policy Confirms Plaintiffs' Consent............... 12

    B. Plaintiffs' Claims Against Meta Fail Because Plaintiffs Fail To Allege That Meta "Intentionally" Obtained Plaintiffs' Confidential Communications ...................................................................................... 13

    C. Plaintiffs' Section 632 Claim Fails For Additional Reasons ................. 16

        1. Intangible Code Like The Pixel Is Not A "Device" ................ 16

        2. Plaintiffs Do Not Plausibly Allege Meta "Used" A Device To "Eavesdrop Upon" Or "Record" Plaintiffs' Communications ........................................................................ 17

        3. Plaintiffs Do Not Allege Their Communications Were "Confidential" ......................................................................... 18

    D. Plaintiffs Fail To Allege A Highly Offensive Invasion of Privacy .................... 19

V. CONCLUSION.................................................................................................... 20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

META'S MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-08852-JSC

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) ................................................................................................ 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................... 8, 15

*B.K. v. Desert Care Network*,
2024 WL 1343305 (C.D. Cal. Feb. 1, 2024) ........................................................................ 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................... 8

*Belluomini v. Citigroup Inc.*,
2013 WL 5645168 (N.D. Cal. Oct. 16, 2013) ...................................................................... 19

*Boulton v. Community.com, Inc.*,
2025 WL 314813 (9th Cir. Jan. 28, 2025) ............................................................................ 18

*Caraccioli v. Facebook, Inc.*,
167 F. Supp. 3d 1056 (N.D. Cal. 2016) ................................................................................ 15

*Davis v. Fresno Unified Sch. Dist.*,
14 Cal. 5th 671 (2023) .......................................................................................................... 17

*Doe I v. Google LLC*,
2025 WL 1616720 (N.D. Cal. June 6, 2025) ........................................................................ 14

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) ............................................................... 2, 13, 14, 15

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ................................................................................ 14

*Est. of Kramme*, 20 Cal. 3d 567, 572 n.5 (1978) ........................................................................ 13

*F.B.T. Prods., LLC v. Aftermath Recs.*,
621 F.3d 958 (9th Cir. 2010) ................................................................................................ 11

*Flanagan v. Flanagan*,
27 Cal.4th 766 (2002) ..................................................................................................... 18, 19

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) .......................................................................... 19, 20

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024) ................................................................... 9, 11

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ................................................................................................ 13

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) ...................................................................................................... 19

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024) ............................................................... 19

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 815 (N.D. Cal. 2020) ................................................................. 14

*In re Google Location History Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) ....................................................................... 16

*In re iPhone Application Litig*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ................................................................ 19, 20

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ........................................................................ 11

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025), *appeal filed*, No. 25-2857 (9th Cir.
May 2, 2025) ............................................................................................................. 9, 13

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ........................................................................................................ 17

*Lloyd v. Facebook*,
2023 WL 1802415 (N.D. Cal. Feb. 7, 2023) *aff'd in relevant part*, 2024 WL
3325389 (9th Cir. Jul. 8, 2024) ................................................................................... 10

*Lloyd v. Facebook*,
2024 WL 3325389 (9th Cir. July 8, 2024) ................................................... 2, 9, 11, 15

*Lozano v. City of Los Angeles*,
73 Cal. App. 5th 711 (2022) ....................................................................................... 15

*M.D. v. Google LLC*,
2025 WL 2710095 (N.D. Cal. Sept. 23, 2025) ............................................................. 9

*Meta Platforms, Inc. v. Nguyen*,
2023 WL 8686924 (N.D. Cal. Nov. 21, 2023) ............................................................ 10

*Moreno v. San Francisco Bay Area Rapid Transit Dist.*,
2017 WL 6387764 (N.D. Cal. Dec. 14, 2017) ............................................................ 16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

META'S MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-08852-JSC

*New Mexico ex rel. Balderas v. Google, LLC*,
   489 F. Supp. 3d 1254 (D.N.M. 2020) .................................................................................... 9

*People v. Braden*,
   14 Cal. 5th 791 (2023) .............................................................................................. 16, 17

*People v. Drennan*,
   84 Cal. App. 4th 1349 (2000) ............................................................................................. 18

*People v. Gray*,
   58 Cal. 4th 901 (2014) ....................................................................................................... 16

*People v. Hyatt*,
   109 Cal. App. 5th 735 (2025) ......................................................................................... 8, 17

*People v. Nakai*,
   183 Cal. App. 4th 499 (2010) ............................................................................................. 19

*People v. Superior Ct. of Los Angeles Cnty.*,
   70 Cal. 2d 123 (1969) ........................................................................................... 13, 14, 15

*R.C. v. Sussex Publishers, LLC*,
   2025 WL 948060 (N.D. Cal. Mar. 28, 2025) ..................................................................... 19

*Rodriguez v. Google, LLC*,
   2021 WL 2026726 (N.D. Cal. May 21, 2021) .............................................................. 18, 19

*Silver v. Stripe*,
   2021 WL 3191752 (N.D. Cal. July 28, 2021) ...................................................................... 9

*Smith v. Facebook, Inc.*,
   262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) ...................... 13

*Smith v. Facebook, Inc.*,
   745 F. App'x 8 (9th Cir. 2018) ............................................................................... 2, 9, 11, 12

*Smith v. LoanMe, Inc.*,
   11 Cal.5th 183 (2021) ........................................................................................................ 18

*United States v. Christensen*,
   828 F.3d 763 (9th Cir. 2015) ............................................................................................. 14

*Vartanian v. VW Credit, Inc.*,
   2012 WL 12326334 (C.D. Cal. Feb. 22, 2012) ................................................................... 15

*Weston v. Lefiti*,
   2024 WL 4579237 (9th Cir. Oct. 25, 2024) ........................................................................ 20

## STATUTES

Cal. Civ. Code § 3515 ............................................................................................................. 9

Cal. Penal Code § 632 ..................................................................................................... passim

Cal. Penal Code § 632(a) .................................................................................................. 8, 16

Cal. Penal Code § 632(c) ...................................................................................................... 18

## RULES

Rule 12(b)(6) ........................................................................................................................ 8

## OTHER AUTHORITIES

*Device*, Merriam-Webster Online (https://www.merriam-webster.com/dictionary/device) (2017) ...................................................................... 16

*Device,* Google Dictionary, www.google.com/search?q=Dictionary (2017) .............................. 16

## I.   INTRODUCTION

This action is a duplicate of an earlier case. Plaintiffs previously sued Meta, along with website developer Wisp, over a year ago, alleging that Wisp improperly sent their online purchase information to Meta using source code (the "Meta Pixel" or "Pixel") that Meta makes publicly available to web developers to integrate into their websites. After amending their complaint twice (including in response to Meta's first motion to dismiss) and settling with Wisp and its parent companies, Plaintiffs voluntarily dismissed their lawsuit days before Meta's response to their second amended complaint was due. Plaintiffs then refiled in state court, and Meta removed. For all the same reasons as before, Plaintiffs' allegations remain fundamentally deficient: Plaintiffs seek to blame Meta for alleged eavesdropping and invasion of privacy based on Wisp's integration of Pixel code on its website, but Plaintiffs' allegations about *Wisp*'s alleged wrongdoing fail to state any claim against Meta.

Meta makes its Pixel code publicly available to web developers so they can improve their services and better understand and reach their users, including through advertising. Before incorporating Meta Pixel code into their websites, developers must agree to Meta's Business Tools Terms. In doing so, developers agree to provide, "on each web page where [Meta's] pixels are used," "robust and sufficiently prominent notice" that Meta may receive information from the website and to obtain all rights to disclose the data that they send to Meta. Ex. 18 at 2. They also "represent and warrant that" they "will not share Business Tool Data with [Meta] that [they] know or reasonably should know … includes … sensitive information." *Id.* at 1. Website developers alone choose whether and how to incorporate Meta Pixel code into their websites, and they have control over what data to send to Meta (if any), subject to these contractual requirements. As for consumers, Facebook and Instagram users—including Plaintiffs—agree to Meta's Terms of Service and policies when they sign up for an account. Those Terms inform users that Meta "use[s] your personal data to help determine which personalized ads to show you." Ex. 6 at 1. And Meta's Privacy Policy discloses that third-party websites can use Meta Pixel code and that when they do, the information collected may be shared with Meta. The Privacy Policy explains, for example, that Meta "receive[s] information" from third parties "about a variety of your information and

META'S MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-08852-JSC

activities"—including "[p]urchases and transactions you make" on other websites. Ex. 10 at 6.

Plaintiffs nevertheless seek to hold Meta liable for Wisp's alleged use of code from the Meta Pixel to send data about their activity on Wisp's website. Both of Plaintiffs' claims—under Section 632 of the California Invasion of Privacy Act ("CIPA") and for invasion of privacy under the California constitution—fail and should be dismissed with prejudice.

*First*, Plaintiffs cannot state either of their claims because Plaintiffs consented to Meta's receipt of data about their purchase activity on other websites. As the Ninth Circuit has held, Meta's disclosures in its Terms of Service, Privacy Policy, and Cookies Policy establish consent for Meta to receive data from third parties about users' activity on third-party websites. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 8-9 (9th Cir. 2018) (affirming dismissal of CIPA and privacy claims because Meta's policies disclosed that Meta would receive data from third-party sites); *Lloyd v. Facebook*, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024) (similar). And Wisp's Privacy Policy, which disclosed that Wisp uses "pixel tags" and third-party analytics to track user interactions with the website and enhance its advertising, confirms Plaintiffs were on notice of the conduct they challenge. Ex. 23 at 5. Plaintiffs therefore fail to allege, and cannot allege, lack of consent to the data sharing they challenge.

*Second*, Plaintiffs also fail to allege that Meta acted with the requisite *intent* to obtain the information at issue. Plaintiffs' allegations that *Wisp* improperly collected and disclosed their "confidential prescription information," Compl. ¶¶ 8, 10, do not show that *Meta* had the necessary intent to allegedly "eavesdrop" upon or "record" this information. Like the multiple previous complaints Plaintiffs filed, this complaint lacks any factual allegations demonstrating Meta's intent. And Meta's Business Tools Terms prohibiting developers from sending any "sensitive" or "health" information demonstrate that Meta "purposefully acted so as *not* to receive any personal health information." *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 840 (N.D. Cal. 2024) ("*Google Pixel I*") (emphasis in original). This too defeats Plaintiffs' claims.

*Third*, Plaintiffs' claims also fail for numerous additional, claim-specific reasons. Plaintiffs' Section 632 claim fails because the statute penalizes only using a "device" to eavesdrop on or record a communication, but intangible software code like the Pixel is not a "device."

Plaintiffs also cannot state their eavesdropping claim because Meta's alleged *receipt* of data *from Wisp* fails to show that *Meta* "used" Pixel code to engage in real-time eavesdropping on or recording of Plaintiffs' communications, as Section 632 requires. The Section 632 claim further fails because Plaintiffs cannot allege any reasonable expectation that their internet purchase activity would *not* be "recorded," as required to allege a "confidential communication" under the statute. And Plaintiffs' invasion of privacy claim fails because Meta's receipt of information is not the kind of highly offensive conduct this claim requires.

Plaintiffs' claims against Meta should be dismissed in their entirety, and because Plaintiffs have repeatedly failed to cure the defects in their claims, dismissal should be with prejudice.

## II.     BACKGROUND[1]

### A.     The Meta Pixel

The Meta Pixel is publicly available software code that many businesses choose to integrate into their websites. Compl. ¶ 33. That code allows businesses to "measure the effectiveness of [their] advertising" and "understand[] the actions people take on [their] website[s]." "About Meta Pixel," Ex. 1 at 1. Website developers, not Meta, decide whether to install the Meta Pixel on their websites, Compl. ¶ 33, and select what user actions to measure. "Best practices for Meta Pixel setup," Ex. 2 at 1-2. These actions are referred to as "events." Compl. ¶ 32. Although there are "standard events," *id.*, like adding a product to a shopping cart, *see* "About standard and custom website events," Ex. 3 at 2; *see* Ex. 2, web developers are not required to use any particular event. To the contrary, they choose how to configure the code and which events to use, and Meta explains how they can configure the Pixel code so that they do *not* capture data they do not want to send. "Advanced – Meta Pixel," Ex. 4. For example, Meta explains that Pixel code "only" measures events "on the pages you added them to." Ex. 2 at 2. It also provides instructions for developers to configure the Pixel code so as "not to send [certain] additional information"—like "button click" data—and to "restrict the data sent to one of the Pixels on your website." Ex. 4 at 8.

For the events that web developers do decide to send to Meta, web developers may view

---

[1] Unless otherwise indicated, the facts recited herein are based on the allegations in the complaint and are accepted as true only for purposes of this motion.

that information on an "Events Manager" page. *See* Compl. ¶ 35. Businesses can use this data about how users interact with their websites to improve their services and measure the effectiveness of their advertising. Ex. 1 at 1. Businesses can also reach customers who have already engaged with their products by showing them targeted ads on Meta's services. *See* Compl. ¶¶ 29-30, 35. The Pixel thus helps businesses to "better reach and serve people who might be interested in their products and services." *Id.* ¶ 31.

### B.    Meta's Terms And Policies

Meta publishes policies for Facebook and Instagram users (like Plaintiffs) that explain how Meta receives and uses data, including through web developers' incorporation of Meta Pixel code. Meta's policies disclose that businesses may integrate Pixel code into their websites, and that when they do so, websites may share data with Meta. Meta also publishes terms and policies that govern developers' use of Meta Pixel code, including by mandating that they provide prominent notice of the Pixel on their websites and refrain from sending certain information to Meta.

### 1.    Meta's Terms Of Service, Privacy Policy, and Cookies Policy

When Facebook users—like Plaintiffs, Compl. ¶ 11—sign up for Facebook, they agree to Meta's Terms of Service, Privacy Policy, and Cookies Policy. *See* Facebook Sign-Up Page, Ex. 5 (cited at Compl. ¶ 27 n.5) (stating that "[b]y clicking Sign Up, you agree to our Terms, Privacy Policy, and Cookies Policy"); *see also*, *e.g.*, Ex. 6 at 1 (Terms "govern [the] use" of Meta products).[2] Meta's Terms explain that "businesses and organizations, and other persons pay us to show you ads for their products," and that Meta "use[s] your personal data to help determine which personalized ads to show you." *Id.* As part of using Meta's free services, users "agree that [Meta] can show you ads that [it] think[s] may be relevant to you and your interests." *Id.*

Meta's Privacy Policy explains the data that Meta collects and receives, including from third parties. It explains that businesses can use tools like Meta Pixel code to "advertise or support their products" and "understand and measure how people are using their products and services and

---

[2] All references to the Meta terms and policies refer to the versions in effect when Plaintiff A.A. alleged that she made her purchase from Wisp on August 25, 2023. *See* Meta Terms of Service, Ex. 6 at 8 (explaining that "[o]nce any updated Terms are in effect, you will be bound by them if you continue to use [Meta] Products"). The language was materially the same throughout the time Plaintiff C.M. alleges she used Wisp, from 2022 through 2024. *See* Compl. ¶ 9.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

4

META'S MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-08852-JSC

how well their ads are working." Ex. 10 at 14. Meta informs users that these third parties "collect your information when you visit their site or app or use their services." *Id.* at 6. Meta's Privacy Policy further discloses that Meta "receive[s] information" from those third parties "about a variety of your information and activities on and off [Meta's] Products," including "device information," "[p]urchases and transactions you make," "[h]ow you use [third parties'] products and services," and "[w]ebsites you visit and cookie data." *Id.*; *see also id.* at 8 (Meta "receive[s] information using cookies and . . . the Meta Pixel"). The Policy also discloses that Meta receives identifying information, like "advertising device ID" and "cookies," that "helps [Meta] match your activities with your account," and explains that Meta "connect[s] information from partners to your account." *Id.* at 6.

The Terms and Privacy Policy also link to Meta's Cookies Policy,[3] which explains that Meta "use[s] cookies" "to store and receive identifiers" if a user "ha[s] a Facebook account" or "visit[s] other websites and apps that use the Meta Products," including the Meta Pixel. Ex. 15 at 1 (cited at Compl. ¶ 48 n.28). The Cookies Policy explains that Meta "uses cookies and receives information," "including device information and information about your activity," when users visit websites where businesses have "incorporate[d] Meta technologies into their websites." *Id.* It also reiterates that businesses may use "Meta Pixel" code to share information about "your interactions with them." *Id.* at 10. The Cookies Policy, like the Privacy Policy, discloses that Meta "use[s] cookies" to "deliver ads to people who have previously visited a business's website [or] purchased its products." *Id.* at 5. The Cookies Policy also explains that "business partners" may set cookies "in their own websites' domains," like the _fbp cookie, to "personalise content (including ads)" and "produce analytics." *Id.* at 9.

### 2. Meta's Business Tools Terms

Meta separately sets forth restrictions on how the Meta Pixel may be used through its Business Tools Terms, which bind the web developers and businesses that choose to integrate Pixel code into their websites. *See* Business Tools Terms, Ex. 18 at 1 (explaining that the "Business Tools Terms govern the use of" the data web developers collect).

---

[3] *See* Meta Terms of Service, Ex. 7 at 1; Meta Privacy Policy, Ex. 10 at 1, 8, 14.

Meta's Business Tools Terms provide that businesses using Meta Pixel code "represent and warrant that [they] have provided robust and sufficiently prominent notice" "on each web page where [Meta's] pixels are used." *Id.* at 2. The Business Tools Terms also require businesses to represent that they "have all of the necessary rights and permissions and a lawful basis (in compliance with applicable laws, regulations and industry guidelines) for the disclosure and use" of any data they share. *Id.* at 1. And the Business Tools Terms specifically prohibit developers from sending sensitive data to Meta, requiring developers to "represent and warrant that" they "will not share Business Tool Data with us that [they] know or reasonably should know . . . includes health . . . information" or "sensitive" information. *Id.*

**C.     Wisp's Privacy Policy**

Wisp provides "convenient access" to prescription and over-the-counter "medications for the treatment of sexual and reproductive health issues" through its website (www.hellowisp.com). Compl. ¶¶ 1-2. Wisp publishes its own Terms of Service and an incorporated Privacy Policy. Exs. 20-26; *see* Second Am. Compl. ¶ 10, Dkt. 55, No. 3:24-cv-05733 (N.D. Cal.) (previous complaint alleging that "Plaintiffs [A.A. and C.M.] agreed to the Terms and Conditions, which governed the use of the Website"). The Privacy Policy discloses that Wisp collects "information about [users] when" they use the website, including through "[c]ookies and [o]ther [e]lectronic technologies," like "pixel tags." Ex. 23 at 4-5.[4] In particular, Wisp explains that it collects information "related to the ways in which [users] interact with" the website and "may use third-party analytics providers or service providers and technologies, including cookies and similar tools"—like pixels—"to assist in collecting this information." *Id.* at 4. Wisp also discloses that it uses the information collected through "pixel tags" to "enhance [its] interest-based advertising." *Id*. at 5.[5] The Privacy Policy

---

[4] All references to Wisp's Privacy Policy are to the version effective as of May 24, 2023, when both Plaintiffs allege they used the website. *See* Ex. 23; *see* Compl. ¶ 8 (A.A. alleging use on August 25, 2023); *id.* ¶ 9 (C.M. alleging use "[f]rom approximately 2022 through" June 10, 2024). The other applicable versions of Wisp's Privacy Policy use similar language, except where otherwise noted. *See* Ex. 22; Ex. 24; Ex. 25; Ex 26.

[5] Before January 1, 2023, Wisp used only the term "web beacons" in its Privacy Policy, but similarly disclosed that such "pieces of code" could be used to "collect advertising data" and that Wisp used "[a]nalytic tools and services, which are sometimes offered by third parties, and which track … information about a website's … traffic, sales, audience and similar information, and

notes that such information is "anonymous" but separately explains that Wisp also collects unique device identifiers, including through third-party cookies, and that "[c]ookies used by our business partners" may also capture "web page interactions" on Wisp's site and be used "to display [Wisp] ads on other websites and services based on information about your use of the Services and on your interests (as inferred from your online activity)." *Id.* at 4.[6]

### D.    Plaintiffs' Complaint

Plaintiff A.A. alleges that she "was prescribed and ordered Norethindrone birth control medication through [Wisp's] website" on August 25, 2023. Compl. ¶ 8. Plaintiff C.M. alleges that she "attended [] telehealth appointment[s]" and "purchased . . . prescribed medication" from Wisp on March 7, 2022 and June 10, 2024. *Id.* ¶ 9.

According to Plaintiffs, Wisp incorporated Pixel code in such a way that it sent two types of actions "[w]hen a consumer purchase[d] birth control products from the [Wisp] Website": the fact that a product (like medication) was added to the cart, *see id.* ¶¶ 41-43, and the fact that a product was purchased, *see id.* ¶ 44. Plaintiffs allege that based on those actions, the Pixel code generated specific "events" titled "AddToCart" and "SubscribedButtonClick," which consisted of strings of code that were then transmitted to Meta. *Id.* ¶¶ 41-43. Plaintiffs also allege that encrypted or unencrypted "identifiers" were sent "alongside the event data" through cookies, which either consisted of, or which Meta could link to, Facebook IDs. *Id.* ¶¶ 45-55. Plaintiffs do not allege that Wisp sent customer names or contact information, appointment-related information, or any information beyond the add-to-cart and purchase actions they took on the website. Plaintiffs allege that "[a]fter" this data was collected, Meta "processed, analyzed, and assimilated [this information] into datasets." *Id.* ¶ 58.

Plaintiffs allege that they had Facebook accounts when they "accessed and used [Wisp's] Website," and that "Wisp disclosed [their] confidential prescription information" to Meta when

which may be used for various reasons [including] marketing research … and conversion tracking." *See* Ex. 25 at 5-6 (Wisp Apr. 22, 2022 Privacy Policy); Ex. 26 at 5-6 (Wisp Sept. 25, 2020 Privacy Policy).

[6] Before January 1, 2023, the Privacy Policy used somewhat different language, but similarly disclosed that Wisp used cookies, that it could share the information it collected with "third parties," and that it "collect[ed] advertising data." *See* Ex. 25 at 5-6 (Wisp Apr. 22, 2022 Privacy Policy); Ex. 26 at 4-5 (Wisp Sept. 25, 2020 Privacy Policy).

they made their purchases. *Id.* ¶¶ 8-11. At some point after their purchases, Plaintiffs allegedly received targeted advertisements on Facebook based on their Wisp orders. *Id.* ¶ 11.

Plaintiffs bring claims against Meta for its alleged receipt of information under Section 632 of CIPA and for invasion of privacy under the California constitution. *Id.* ¶¶ 79-96.

## III.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009). "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

## IV.   ARGUMENT

Plaintiffs urge this Court to adopt an expansive interpretation of California's criminal eavesdropping statute. But California law requires the opposite: Because Section 632 carries criminal penalties, as well as harsh civil penalties, it must be construed "as favorably to [Meta] as its language and the circumstances of its application may reasonably permit." *People v. Hyatt*, 109 Cal. App. 5th 735, 793-94 (2025). And Plaintiffs' attempt to impose liability under an inapt invasion-of-privacy claim fares no better. Plaintiffs' complaint turns on allegations that *Wisp* incorporated Meta Pixel code on its website and that *Wisp* configured that code to send certain information to Meta, supposedly without proper disclosures or consent. These allegations fail to state any claim against Meta for two cross-cutting reasons: Plaintiffs consented to Meta's receipt of the information at issue, and Plaintiffs fail to allege that Meta intended to obtain such information. Plaintiffs' claims also suffer from numerous additional deficiencies, even though this is Plaintiffs' *fourth* iteration of their complaint. It should be dismissed with prejudice.

### A.   Plaintiffs' Claims Fail Because Plaintiffs Consented To Meta's Receipt Of Data Reflecting Their Activity On Wisp's Website

Plaintiffs cannot state either of their claims because they consented to Meta's receipt of information about their activity on third-party websites, including through code from the Meta

Pixel. CIPA Section 632 imposes liability for eavesdropping only "without the consent of all parties." Cal. Penal Code § 632(a). And because "lack of consent is an element" of Plaintiffs' CIPA claim, Plaintiffs must allege facts showing lack of consent. *Silver v. Stripe*, 2021 WL 3191752, at *2, 4-5 (N.D. Cal. July 28, 2021) (dismissing CIPA claims where "terms plainly disclose[d]" data collection); *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1054, (N.D. Cal. 2025), *appeal filed*, No. 25-2857 (9th Cir. May 2, 2025) (dismissing CIPA, Wiretap Act, and privacy claims where plaintiffs "consented to, and were informed of, the use of cookies and pixels on the Website"); *M.D. v. Google LLC*, 2025 WL 2710095, at *4 (N.D. Cal. Sept. 23, 2025) (explaining that "to state claims under CIPA," plaintiffs "must plausibly allege that the complained-of interception occurred without consent," and dismissing claims based on consent). Similarly, Plaintiffs cannot allege a "reasonable expectation of privacy," as required to state their invasion of privacy claim, if they were on notice of the data collection about which they complain. *Hammerling v. Google, LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (dismissing invasion of privacy claim because Google "expressly disclosed" tracking on third-party apps); *Lloyd*, 2024 WL 3325389, at *2 (similar); *see generally* Cal. Civ. Code § 3515 ("A person who consents to an act is not wronged by it.").

Plaintiffs' allegations do not come close to establishing lack of consent to Meta's alleged receipt of information. Plaintiffs include conclusory assertions that their communications were intercepted "without [their] consent," Compl. ¶ 80; *see id.* ¶¶ 7, 91, and that they had a "reasonable expectation of privacy" in their information, *id.* ¶ 82; *see id.* at ¶ 93. But such assertions are insufficient without factual allegations to support them. *See, e.g.*, *New Mexico ex rel. Balderas v. Google, LLC*, 489 F. Supp. 3d 1254, 1263 (D.N.M. 2020) (plaintiffs' "conclusory" allegation of "inadequate notice" was insufficient to state privacy-related claim). Instead, Plaintiffs must allege *facts* demonstrating their lack of consent—*i.e.*, showing that "the circumstances, considered as a whole" would not have permitted a "reasonable person" to understand "that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Smith*, 745 F. App'x at 8. Here, Plaintiffs fail to allege any facts demonstrating that they did not consent to Meta's receipt of their information. Nor could they. Both Meta's policies and Wisp's Privacy Policy

demonstrate that Plaintiffs *did* consent.

### 1.    Plaintiffs Consented By Agreeing To Meta's Policies

Plaintiffs allege that they had active Facebook accounts when they used Wisp. Compl. ¶ 11. And like "all users," they were therefore required to "agree" to the Terms (and incorporated policies) "to create a Facebook account." *Lloyd v. Facebook*, 2023 WL 1802415, at *1 (N.D. Cal. Feb. 7, 2023) *aff'd in relevant part*, 2024 WL 3325389 (9th Cir. Jul. 8, 2024); *see also, e.g.*, *Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686924, at *2 (N.D. Cal. Nov. 21, 2023) ("All Facebook users must agree to its Terms of Service[.]"); Facebook Sign-Up Page, Ex. 5 (cited at Compl. ¶ 27 n.5) (stating that "[b]y clicking Sign Up, you agree to our Terms, Privacy Policy, and Cookies Policy").

Meta's policies clearly disclose that Meta receives data from third parties that choose to use code from the Meta Pixel, including data that Meta can use to match web activities to particular Facebook accounts to serve ads. For example, Meta's Privacy Policy discloses that third parties can use tools like Meta Pixel code to "collect your information when you visit their site," Ex. 10 at 6, and that Meta "receive[s]" such information, *id.* at 6, 8. The Privacy Policy also specifically addresses purchase information—the information at issue here—explaining that third parties collect and share with Meta information about "[p]urchases and transactions you make" on other websites "using non-Meta checkout experiences." *Id.* at 6. And the Policy further discloses that Meta receives identifying information, including "cookies," that "helps [Meta] match your activities with your account." *Id.* The Cookies Policy then reiterates these disclosures, explaining that businesses may use "Meta Pixel" code to share information about "your interactions with them"; that Meta "receive[s] identifiers" through cookies when users visit websites that "incorporate Meta technologies" like Pixel code; and that Meta uses that information to "deliver ads to people who have previously visited a business's website [or] purchased its products." Ex. 15 at 1, 5, 10. That is precisely the conduct that Plaintiffs complain about: they allege that they "purchased" medication from Wisp, Compl. ¶¶ 8-9; that Wisp shared their "purchase[]" actions with Meta using Meta Pixel code, *id.* ¶ 44; that certain identifiers were also sent through "cookies," *id.* ¶¶ 46-54; that Meta "link[ed]" information to "corresponding Facebook profiles," *id.* ¶ 55; and

that Plaintiffs were later shown related advertisements, *id.* ¶ 11. Because the alleged conduct is directly disclosed by Meta's policies, it is squarely within the scope of Plaintiffs' consent.

Indeed, the Ninth Circuit has already twice concluded that "Facebook's data policy gives clear notice that third party partners may share data with Facebook." *Lloyd*, 2024 WL 3325389, at *2; *see also Smith*, 745 F. App'x at 8-9. In *Smith*, the Ninth Circuit recognized that Meta's policies disclose the precise conduct at issue here: "[a] reasonable person viewing [Facebook's] disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." 745 F. App'x at 8-9. The court thus held that the plaintiffs there had consented to "collect[ion] and us[e] [of] their browsing data from various healthcare-related websites" and affirmed dismissal of CIPA and privacy claims. *Id* at 8. Similarly, in *Lloyd*, the Ninth Circuit affirmed dismissal of a privacy claim where the plaintiff alleged that Meta "impermissibly track[ed] her online activity," "because Facebook's data policy gives clear notice" that such data will be shared from third parties. 2024 WL 3325389, at *2.

As in *Smith* and *Lloyd*, Meta's policies confirm that Plaintiffs consented to Meta's receipt of data from third-party websites and use of that data for advertising purposes. Those disclosures should be given full effect. While some courts have held that disclosures must "specifically indicate" the particular types of data at issue to establish consent where "sensitive" data is involved, *see, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022), Meta's Privacy Policy *did* specifically disclose that it would obtain "purchases and transactions [users] make" and "match [those] activities with [a user's] account"—exactly what Plaintiffs allege Meta did here. Ex. 10 at 5. Requiring any more specific disclosure would contravene Ninth Circuit precedent. Courts must look to the plain terms of a contract and cannot "reject [those terms] simply because [they] may deviate from [the court's] expectations." *Hammerling*, 2024 WL 937247 at *2. In *Hammerling*, the Ninth Circuit thus rejected a narrow reading of Google's privacy policy where the policy broadly "disclose[d] Google's collection of user activity data in third-party apps." *Id.*; *see also F.B.T. Prods., LLC v. Aftermath Recs.*, 621 F.3d 958, 964 (9th Cir. 2010) ("[a] contractual term is not ambiguous just because it is broad"). Similarly, when the Ninth Circuit affirmed dismissal of claims regarding Meta's receipt of "browsing data from various healthcare-

related websites" in *Smith*, it explained that even if such information could be deemed sensitive, "many other kinds of [web-browsing data] are equally sensitive" and "the practice complained of" nevertheless "falls within the scope of plaintiffs' consent to Facebook's Terms and Policies." 745 F. App'x at 8-9. The same is true here.

### 2.   Wisp's Privacy Policy Confirms Plaintiffs' Consent

Although Meta's Terms and policies alone are sufficient to establish consent, the disclosures in Wisp's Privacy Policy further confirm that Plaintiffs were on notice of and consented to the data sharing of which they now complain. Wisp's Terms incorporate its Privacy Policy. Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; *see* Second Am. Compl. ¶ 10, Dkt. 55, No. 3:24-cv-05733 (N.D. Cal.) (previous complaint alleging Plaintiffs agreed to Terms). And Wisp's Privacy Policy expressly discloses that Wisp uses technologies including "pixel tags" to collect information about website usage to "enhance [its] interest-based advertising." Ex. 23 at 4-5; *see also* Ex. 25 at 5 (disclosing use of "web beacons" and "pieces of code" to "monitor your activity on the website" and "collect advertising data"). It also discloses that Wisp "may use third-party analytics providers or service providers and technologies, including cookies and similar tools"—like pixels—"to assist in collecting" information "related to the ways in which [users] interact with" its website, including "pages visited and activities conducted while using the Services." Ex. 23 at 4; *see also* Ex. 25 at 6 (disclosing that third-party "[a]nalytic tools" could be used to "generate information" about the website's "traffic, sales, audience and similar information," including for the purposes of "marketing research … and conversion tracking"). While the Privacy Policy notes that information collected through "pixel tags" is "anonymous," it separately explains that Wisp also collects unique device identifiers, including through third-party cookies; that "[c]ookies used by our business partners" may capture "web page interactions" on Wisp's site; and that businesses "use Cookies to display [Wisp] ads on other websites and services based on information about your use of the Services and on your interests." Ex. 23 at 4-5. These disclosures put users, including Plaintiffs, on notice of Wisp's use of technologies like Pixel code to track users' website activity and send identifiers through cookies. Given these disclosures, Plaintiffs cannot plausibly allege lack of consent or any reasonable expectation of privacy as to Meta's receipt of their purchase

activity on Wisp.

Plaintiffs' eavesdropping and invasion of privacy claims thus fail because, even after filing three complaints in federal court and this complaint in state court, Plaintiffs cannot allege lack of consent. And because "[n]o further allegations could allow Plaintiffs to bring claims arising out of conduct which they consented to," amendment "would be futile." *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 956 (N.D. Cal. 2017) (citation omitted), *aff'd*, 745 F. App'x 8 (9th Cir. 2018); *see Lakes*, 777 F. Supp. 3d at 1060. Plaintiffs' claims should therefore be dismissed with prejudice.

**B.    Plaintiffs' Claims Against Meta Fail Because Plaintiffs Fail To Allege That Meta "Intentionally" Obtained Plaintiffs' Confidential Communications**

In addition to obtaining broad consent from its users, Meta, like many companies, simultaneously obtains representations and warranties from—and places restrictions on—developers that use its Business Tools. In particular, Meta's Business Tools Terms specifically *prohibit* businesses from sending it any health or sensitive information. Consistent with that prohibition, both of Plaintiffs' claims fail because Plaintiffs' allegations that Wisp disclosed their "confidential prescription information," Compl. ¶¶ 8, 10, do not plausibly allege that Meta "intentionally" obtained that information, as their claims require. Cal. Penal Code § 632; *Google Pixel I*, 741 F. Supp. 3d at 843 (intent "is a necessary element of an invasion of privacy claim"); *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286, 295 (2009) (requiring an "intentional[] intru[sion]" for invasion of privacy).

To establish intent, California law requires a plaintiff to allege the defendant "use[d]" "recording equipment" "with the purpose or desire of recording a confidential conversation, or with the knowledge to a substantial certainty that [its] use of the equipment will result in the recordation of a confidential conversation." *People v. Superior Ct. of Los Angeles Cnty.*, 70 Cal. 2d 123, 134 (1969) ("*Smith*"). The California Supreme Court has explained that this requires "an intent to bring about the proscribed result rather than an intent merely to do an act which unintentionally brought about that result." *Est. of Kramme*, 20 Cal. 3d 567, 572 n.5 (1978). That standard is consistent with the Ninth Circuit's holding, under the federal Wiretap Act, that "intent" means a defendant must have acquired the data "purposefully and deliberately and not as a result

of accident or mistake." *United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015) (citation omitted); *see also Google Pixel I*, 741 F. Supp. 3d at 840 (applying *Christensen* standard to CIPA claims). And this standard cannot be satisfied by alleging that Meta intended to record "any old communication"—Plaintiffs must allege Meta intended to collect *confidential* communications. *Doe I v. Google LLC*, 2025 WL 1616720, at *2 (N.D. Cal. June 6, 2025) ("*Google Pixel II*"). As explained in *Smith*, "a person might intend to record the calls of wild birds on a game reserve and at the same time accidentally pick up the confidential discussions of two poachers. To hold the birdwatcher punishable under [Section 632] for such a fortuitous recording would be absurd." 70 Cal. 2d at 133; *see Google Pixel II*, 2025 WL 1616720, at *2 ("The question is whether Google intended to collect the kinds of communications at issue in this lawsuit.").

To demonstrate intent here, then, Plaintiffs must allege facts showing that Meta "acted consciously and deliberately with the *goal* of" obtaining their health information. *Christensen*, 828 F.3d at 791 (emphasis added).[7] Plaintiffs' allegations here fall far short. Plaintiffs make only conclusory assertions that Meta "intentionally" "eavesdrop[ped] upon or record[ed] [a] confidential communication." Compl. ¶ 80 (citing Cal. Penal Code § 632). But Plaintiffs admit that it was *Wisp*, not Meta, that "integrate[d] this software into their website." *Id.* ¶ 33; *see also id.* ¶ 55 (alleging that "Wisp sent" "identifiers" to Meta).[8] Plaintiffs thus allege no facts suggesting that *Meta* intended to obtain the data at issue, and their bare assertions that Meta acted

---

[7] Some district courts have held that an interception may be "considered intentional where a defendant is aware of the defect causing [the] interception but takes no remedial action." *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (citation omitted). But that does not meet the requirement that the defendant have a "purpose or desire," or "knowledge to a substantial certainty," that a confidential communication will be recorded. *Smith*, 70 Cal. 2d at 134; *see Google Pixel I*, 741 F. Supp. 3d at 840 (explaining that "awareness" analysis is contrary to Ninth Circuit precedent). At minimum, that reasoning is limited to cases involving a *defect* in a defendant's own product where it may be possible to *infer* intent from a defendant's failure to remedy a known issue. *See In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797 815 (N.D. Cal. 2020) (accidental triggering of Google assistant). That reasoning does not apply here, where Plaintiffs allege *third-party* misuse of a common, non-defective tool.

[8] Plaintiffs' allegation that the Meta Pixel is "automatically" configured to send certain information, Compl. ¶ 32, is irrelevant, because Meta also explains to developers that they can avoid sending particular information, including by not integrating Pixel code on a particular web page or by changing its configuration. *See* Ex. 2 at 4 (standard events are included "only on the pages you added them to"); Ex. 4 at 9 (describing how to implement additional code to prevent transmission of data).

"intentionally," Compl. ¶ 77, are insufficient. *See Iqbal*, 556 U.S. at 686-87 ("conclusory" allegation of discriminatory intent insufficient); *Lloyd*, 2024 WL 3325389, at *1 ("conclusory assertion" of intent based on third-party misconduct insufficient); *Vartanian v. VW Credit, Inc.*, 2012 WL 12326334, at *2 (C.D. Cal. Feb. 22, 2012) (intent insufficiently alleged where complaint did not describe "factual circumstances" that made defendant's intent "plausible"). Nor are the allegations that Meta makes money from advertising sufficient, Compl. ¶¶ 27-31, because at most, those allegations suggest Meta intended to collect *some* data—not *confidential* data. That does not suffice. *Smith*, 70 Cal. 2d at 134; *see Lozano v. City of Los Angeles*, 73 Cal. App. 5th 711, 728 (2022) (no intent where devices "might happen to record a confidential communication").

Indeed, Meta's Business Tools Terms expressly instruct developers that they must have "all of the necessary rights and permissions and a lawful basis" to collect and use the data they share. Ex. 18 at 1. And Meta also goes further and prohibits the sharing of certain sensitive information, requiring businesses that use Meta's Pixel code to "represent and warrant that [they] will not share Business Tool Data with [Meta] that [they] know or reasonably should know . . . includes health" information or "sensitive" information. *Id*. Accordingly, to the extent Wisp integrated Meta Pixel code into its website in a way that sent health or sensitive information, *see* Compl. ¶¶ 21-26, Wisp violated Meta's Business Tools Terms. But Wisp's alleged failure to comply with Meta's terms cannot demonstrate *Meta*'s intent. Indeed, by placing those restrictions on Wisp, Meta "purposefully acted so as *not* to receive any personal health information." *Google Pixel I*, 741 F. Supp. 3d at 840. As another court recently concluded, the Business Tools Terms thus show that "Meta either had no intention of receiving the data at issue or had some alternative *mens rea* not rising to the level of intentionality." *B.K. v. Desert Care Network*, 2024 WL 1343305, at *7 (C.D. Cal. Feb. 1, 2024) (dismissing aiding-and-abetting CIPA claim for failure to allege predicate violation by Meta); *cf. Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1063 (N.D. Cal. 2016) (holding that plaintiff's allegation that Facebook failed to remove offensive content did not plausibly allege intentional conduct by Facebook). Each of Plaintiffs' claims should accordingly be dismissed.

## C.    Plaintiffs' Section 632 Claim Fails For Additional Reasons

In addition to the deficiencies above, Plaintiffs' Section 632 claim fails for numerous additional reasons.

### 1.    Intangible Code Like The Pixel Is Not A "Device"

CIPA Section 632 applies only to "use[] [of] an electronic amplifying or recording *device*." Cal. Penal Code § 632(a) (emphasis added). That statutory requirement is fatal to Plaintiffs' claims. Plaintiffs allege that Meta eavesdropped on or recorded data reflecting their activity on Wisp's website through Wisp's use of the Meta Pixel, *see* Compl. ¶ 85, but the Pixel is simply source code, which can be integrated on any website. *See id.* ¶¶ 8, 10, 31, 33. And, as this Court previously explained in interpreting a separate provision of CIPA, software code is not a "device" under the plain meaning of that term. *See Moreno v. San Francisco Bay Area Rapid Transit Dist.*, 2017 WL 6387764, at *5 (N.D. Cal. Dec. 14, 2017) (Corley, J.) (interpreting Section 637.7); *see also In re Google Location History Litig.*, 428 F. Supp. 3d 185, 193 (N.D. Cal. 2019) (agreeing that software is not a "device"). Rather, this Court explained, dictionaries define "device" to mean a specialized piece of *physical* equipment. For example, "Merriam-Webster defines 'device' in relevant part as 'a piece of equipment or a mechanism designed to serve a special purpose or perform a special function,' for example, 'smartphones and other electronic devices' or a 'hidden recording device,'" *Moreno*, 2017 WL 6387764, at *5 (citing Device, Merriam-Webster Online, (https://www.merriam-webster.com/dictionary/device) (2017)), and Google Dictionary defines "device" as "a thing made or adapted for a particular purpose, especially a piece of mechanical or electronic equipment," *id.* (citing Google Dictionary, www.google.com/search?q=Dictionary (2017)). Software code, which is intangible, does not fit those definitions or fall within the plain meaning of the statute.

The statutory context confirms that intangible code is not a "device." California courts "generally presume the Legislature intended [a] word . . . to have the same meaning each time it is used" when "the same word . . . appears in different places within a statutory scheme." *People v. Braden*, 14 Cal. 5th 791, 806 (2023) (quoting *People v. Gray*, 58 Cal. 4th 901, 906 (2014)). That "well-established canon[]" applies here, where both Section 632 and Section 637.7, which this

Court interpreted in *Moreno*, are part of the same legislative act and prohibit using a "device" to record or track information. *Id.* The term "device" in Section 632 should therefore be construed in the same way as in Section 637.7.

And CIPA includes additional contextual indicators confirming that "device" refers to tangible objects. Under the canon of *noscitur a sociis*, "a specific item in a statutory list of items is qualified by the overall type or subject matter characterizing the list," and should be construed accordingly. *Davis v. Fresno Unified Sch. Dist.*, 14 Cal. 5th 671, 689 (2023). Section 632 uses the term "device" alongside other *tangible* objects—for example, it repeats the term "device" in providing that the improperly recorded conversations must take place "by means of a telegraph, telephone, or other device, except a radio." Cal. Penal Code § 632. "Telegraph" and "telephone" are tangible objects, and "device" should be construed in line with those terms, not extended to "bits of code" like the Pixel. Compl. ¶ 31.

Finally, to the extent there is any ambiguity, CIPA is a criminal statute that must be construed "as favorably to [Meta] as its language and the circumstances of its application may reasonably permit." *Hyatt*, 109 Cal. App. 5th at 793-94; *see also Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (rule of lenity applies even in the "noncriminal context" when a statute has "both criminal and noncriminal applications"). Plaintiffs thus fail to plausibly allege that Meta used any "device" to eavesdrop upon or record communications. Their Section 632 claim should therefore be dismissed.

**2.     Plaintiffs Do Not Plausibly Allege Meta "Used" A Device To "Eavesdrop Upon" Or "Record" Plaintiffs' Communications**

Plaintiffs' Section 632 claim also fails because Section 632 covers "use" of a device to "eavesdrop upon" or "record" a plaintiff's confidential communication, but Plaintiffs do not and cannot allege that *Meta* engaged in that conduct. Meta itself does not "use" code from the Pixel; it makes Pixel code publicly available for third parties to integrate into their websites if they choose to do so.

Further, both "eavesdrop" and "record" are actions that, by their plain meaning, must occur *in real time* as the communication is occurring. The statute thus reaches only "simultaneous

dissemination" of a plaintiff's communications, not "secondhand repetition of [] contents." *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 191, 200 (2021); *see People v. Drennan*, 84 Cal. App. 4th 1349, 1356 (2000) (explaining that "records" prohibits "'real time' interception" or "mechanical recording" of a communication). But here, Plaintiffs allege only that *Wisp* used code from the Pixel, and that it did so in such a way that when a user took certain actions on Wisp's website, the code generated specific "events" titled "AddToCart" and "SubscribedButtonClick," Compl. ¶ 42, which Wisp then sent to Meta, *id.* ¶¶ 43-44; *see also, e.g.*, *id.* ¶¶ 8, 55. According to Plaintiffs' own allegations, then, Meta received only "events" (not Plaintiffs' communications), and it did so only "secondhand." That is not the real-time eavesdropping or recording Section 632 prohibits.

### 3.    Plaintiffs Do Not Allege Their Communications Were "Confidential"

Plaintiffs' CIPA Section 632 claim fails for yet another reason: Plaintiffs fail to allege that their communications with Wisp were "confidential" as the statute defines that term. Section 632 applies only to "confidential communications," which are statutorily defined to "exclude[] a communication made . . . in any . . . circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c). To qualify as confidential, "at least one party to the conversation must carry 'an objectively reasonable expectation that the conversation is not being overheard or recorded'"— including by the other party to the conversation. *Rodriguez v. Google, LLC*, 2021 WL 2026726, at *7 (N.D. Cal. May 21, 2021) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776-77 (2002)).

Here, Plaintiffs do not, and cannot, allege an "objectively reasonable expectation" that their purchase actions were not being recorded. Even aside from Meta's express disclosures that information on third-party websites could be recorded, *supra* at 9-11, purchase information is, by its very nature, recorded to fulfill customers' orders. *See Boulton v. Community.com, Inc.*, 2025 WL 314813, at *2 (9th Cir. Jan. 28, 2025) (affirming dismissal of Section 632 claim based on text messages, which "are by nature recorded and so cannot be 'confidential communications'"). Plaintiffs instead allege that they "did not expect third parties, specifically Facebook," to receive their information, Compl. ¶ 83, but "that expectation . . . does not reasonably give rise to the expectation that *nobody* (including the [website]) would record the communications," as Section

632 requires. *Rodriguez*, 2021 WL 2026726, at *7 (dismissing Section 632 claim). Where, as here, "the circumstances reflect that the communications could have easily been shared or viewed," those communications are not "confidential" within the meaning of Section 632. *People v. Nakai*, 183 Cal. App. 4th 499, 518 (2010) (internet chat communications not "confidential").

Some courts in this District, including this Court, have noted a "presumption" that internet communications do not qualify as "confidential," but have found the presumption may be rebutted based on a reasonable expectation of *privacy* in certain "health-related communications." *R.C. v. Sussex Publishers, LLC,* 2025 WL 948060, at *9 (N.D. Cal. Mar. 28, 2025). In this unique statutory context, however, a general expectation of privacy does not suffice. Rather, the California Supreme Court has held that the focus is on reasonable expectations *about recording*, rather than any asserted privacy interest in the information itself. *See Flanagan*, 27 Cal.4th at 776 (rejecting content-based test for "confidential communication"). Because the statutory definition of "confidential" turns on reasonable expectations as to whether a communication would be recorded *by anyone*, Plaintiffs cannot state a claim based on their internet purchases, which were necessarily recorded by Wisp. This too defeats their Section 632 claim.

**D.    Plaintiffs Fail To Allege A Highly Offensive Invasion of Privacy**

Plaintiffs' invasion of privacy claim also fails because allegations that *Wisp* sent purchase data to Meta fail to show that *Meta* committed any highly offensive intrusion, as California law requires. The "highly offensive" standard "set[s] a high bar." *Belluomini v. Citigroup Inc.*, 2013 WL 5645168, at *3 (N.D. Cal. Oct. 16, 2013); *see also In re iPhone Application Litig*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (invasion of privacy must constitute an *"egregious breach* of [] social norms" (quoting *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 26, 37 (1994)). Where "a defendant does not employ secrecy or deception or some other 'bad act' in connection with data collection . . . such behavior does not rise to the level of highly offensive." *Hubbard v. Google LLC*, 2024 WL 3302066, at *8 (N.D. Cal. July 1, 2024); *see also Hammerling v. Google LLC,* 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022) (collection of app usage information not highly offensive where it was not "blatantly deceitful," even if plaintiffs had reasonable expectation of privacy); *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1063 (disclosure of identifiers and geolocation

information was not highly offensive); *Weston v. Lefiti*, 2024 WL 4579237, at *2 n.2 (9th Cir. Oct. 25, 2024) (affirming dismissal of privacy claim where recording was not for purpose of facilitating other impropriety).

Here, Plaintiffs' allegations with respect to Meta fall far short of alleging highly offensive conduct. At most, Plaintiffs allege that Meta passively received data about the purchase actions they took and that they subsequently saw related advertisements. Plaintiffs do not allege that Meta had any hand in Wisp's choice to install Meta Pixel code or how to configure it, much less that Meta acted deceptively to obtain Plaintiffs' information. Meta's alleged *receipt* of information is hardly an egregious breach of social norms, even if that information is sensitive. *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1063; *Hammerling*, 615 F. Supp. 3d at 1090. And that is particularly true where Meta specifically disclosed that it could receive data from third parties that used Pixel code; required web developers to provide prominent notice regarding that use; and *prohibited* the sending of sensitive or health information. *See supra* at 4-6.

## V.   CONCLUSION

Meta respectfully requests dismissal of the complaint, and because Plaintiffs have repeatedly amended but still fail to state their claims, dismissal should be with prejudice.

Dated: October 22, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Melanie M. Blunschi*
   Melanie M. Blunschi (Bar No. 234264)
    melanie.blunschi@lw.com
   Kristin Sheffield-Whitehead (Bar No. 304635)
    kristin.whitehead@lw.com
   Catherine A. Rizzoni (Bar No. 322267)
    cat.rizzoni@lw.com
   505 Montgomery St., Suite 2000
   San Francisco, CA 94111
   Telephone: +1.415.391.0600

   Margaret A. Upshaw (*pro hac vice* forthcoming)
    maggie.upshaw@lw.com

555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant*
*Meta Platforms, Inc.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW