United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

A.A., et al.,

Plaintiffs,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 25-cv-08852-JSC

**ORDER RE: MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

Re: Dkt. Nos. 58, 59

Plaintiffs A.A. and C.M., on behalf of themselves and a putative class, bring claims against Defendant Meta Platforms, Inc. ("Meta") under Section 632 of the California Invasion of Privacy Act ("CIPA"), the California Constitution, and the Federal Wiretap Act, alleging Meta's software recorded Plaintiffs' activities on a website that sells treatment and medications for sexual and reproductive health. (Dkt. No. 54.)[1] The Court previously granted Plaintiffs' Motion for Leave to File a First Amended Class Action Complaint. (Dkt. No. 52.) Defendant now moves to dismiss Plaintiffs' claims (Dkt. No. 58) and seeks judicial notice of certain documents (Dkt. No. 59).[2] Having considered the parties' briefs, and having had the benefit of oral argument on November 5, 2026, the Court GRANTS the motion to dismiss because the FAC's allegations, together with judicially noticeable documents, compel the inference Plaintiffs consented to Meta's conduct.

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] Meta's Privacy Policy (Exhibit 10) (Dkt. No. 58-11), Meta's Cookies Policy (Exhibit 15) (Dkt. No. 58-16), Meta's informational webpage regarding Meta Pixel specifications (Exhibit 5) (Dkt. No. 58-6), and Meta's Business Tools Terms (Exhibit 18) (Dkt. No. 58-19) are incorporated by reference as those documents "form the basis" of Plaintiffs' claims. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted). Meta's remaining unopposed requests for judicial notice or incorporation by reference are denied as moot, as those documents do not affect the outcome of the motions.

United States District Court
Northern District of California

**BACKGROUND**

**I. FIRST AMENDED COMPLAINT ALLEGATIONS**

Plaintiffs are "California residents who maintain a Facebook account and who accessed and used www.hellowisp.com ... to purchase over-the-counter and prescription medications and schedule medical appointments." (Dkt. No. 54 ¶ 1.) The website, run by Wisp, "represents that patients can access 'healthcare' and offers consumers 'access to medications for the treatment of sexual and reproductive health issues.'" (*Id.* ¶ 2.) "Plaintiffs and class members provided their personal information, including health conditions for which they were seeking treatment, when browsing for and purchasing medications and scheduling medical appointments on the [Wisp] Website with the expectation that this information would remain confidential and private." (*Id.* ¶ 7.)

Defendant operates Facebook and offers tools for advertisers to collect data on websites. The tool at issue here is the Facebook Tracking Pixel, a "software script" that "tracks the people and type of actions they take" on websites. (*Id.* ¶ 39.) Defendant "encourages advertisers, like Wisp, to integrate" tools like the Pixel into their websites. (*Id.*)

The Pixel tool tracks a visitor's "action[s] on a website," which are called "events," and these "events" essentially describe the action taken. (*Id.* ¶ 41.) "The tracked information includes private data revealing prescribed medications purchased by consumers on the [Wisp] Website." (*Id.* ¶ 42.) These "events" are written as code and transmitted to Facebook's servers. (*Id.* ¶ 46.) For example, "when a consumer purchases birth control products from the [Wisp] Website, the AddToCart event information shared with Facebook the terms "hellowisp, "birthcontrol," and "tri-sprentec," (*Id.* ¶ 49), which looks like this:

Figure 1:


```
        "status": "COMPLETE",
        "method": "GET",
        "protocolVersion": "HTTP/2.0",
        "scheme": "https",
        "host": "www.facebook.com",
        "actualPort": 443,
        "path": "/tr/",
        "query": "id=253897343916108&ev=AddToCart&dl=https%3A%2F%2Fhellowisp.com%2Fproducts%2Ftri-sprintec-birth-
control%3Fflow%3Dopen&rl=&if=false&ts=1713302543539&cd[content_type]=product&cd[content_ids]=%5B%22L0-A-OT-LP%22%2C%22HL2-OT-
SH%22%2C%22TSP3-SUB-SH%22%2C%22OM1-A-SUB-SH%22%5D&cd[value]=158.66&cd[currency]=USD&sw=1920&sh=1080&v=2.9.153&r=stable&a=tmSimo-GTM-
WebTemplate&ec=13&o=4126&fbp=fb.1.1713302395193.221102072&ler=empty&cdl=API_unavailable&it=1713302395143&coo=false&tm=1&rqm=GET",
        "tunnel": false,
        "keptAlive": true,
        "webSocket": false,
        "remoteAddress": "www.facebook.com/31.13.67.35",
        "clientAddress": "/127.0.0.1",
        "clientPort": 53981,
        "times": {
            "start": "2024-04-16T17:22:23.355-04:00",
            "requestBegin": "2024-04-16T17:22:23.355-04:00",
            "requestComplete": "2024-04-16T17:22:23.356-04:00",
            "responseBegin": "2024-04-16T17:22:23.364-04:00",
```


(*Id.* ¶¶ 48-49.)

The FAC alleges Plaintiff A.A. ordered "Norethindrone birth control medication through the [Wisp] Website" on August 25, 2023, and Plaintiff C.M. "attended [] telehealth appointment[s]" and "purchased Metronidazole [and Norethisterone], [] prescribed medication[s]" from Wisp on March 7, 2022, and June 10, 2024. (*Id.* ¶¶ 9-10.) During the time Plaintiffs accessed and used the Wisp Website, they also maintained an active social media account with Facebook. (*Id.* ¶ 13.) "Unbeknownst to [Plaintiffs]," Facebook intercepted and recorded their "confidential prescription information" through Facebook Tracking Pixel. (*Id.* ¶ 11.) Specifically, "[t]hrough the Facebook Tracking Pixel, Defendant intercepted and recorded 'AddtoCart' and 'SubscribedButtonClick' events, which detail information about which products the patient was purchasing on the website" and "notify[ ] Facebook that the medication was purchased." (*Id.* ¶¶ 48, 50.) Additionally, the Pixel code was "configured to capture a range of [other] 'events,'" including "PageView" and "ViewContent" when Plaintiffs visited the Wisp Website. (*Id.* ¶ 52.) Through the Pixel tool, Facebook "also intercepted [Plaintiffs'] PII, including their full name, email address, and phone number," along with the communications related to Plaintiffs' medical prescription and appointments. (*Id.* ¶ 12.) These "identifiers" were sent "alongside the event data" through cookies, which Facebook used to link data about their purchases to their Facebook accounts. (*Id.* ¶¶ 65-66.) As a result, "Plaintiffs both received targeted advertisements on



United States District Court
Northern District of California

Facebook relating to sexual and reproductive health medications." (*Id.* ¶ 13.) Plaintiffs now seek to bring claims on behalf a putative class of persons whose "personally identifiable information or protected health information" was sent to Facebook "while purchasing products on [Wisp's] Website." (*Id.* ¶ 107.)

## II. PROCEDURAL HISTORY

### A. Plaintiffs' Prior Suit Against Meta and Wisp

In August 2024, Plaintiffs filed suit in this court against Meta Platforms, Inc. and Wisp, Inc., bringing claims under (1) California's Confidentiality of Medical Information Act ("CMIA"), (2) CIPA Section 631, (3) CIPA Section 632, and (4) the California Constitution. (*A.A., et al. v. Wisp, Inc.*, Case No. 24-cv-05733-JSC, Dkt. No. 1.)

Plaintiffs subsequently amended their complaint twice. In November 2024, Plaintiffs amended their complaint to add two new claims, one for negligence and one for wiretapping in violation of 18 U.S.C. § 2511(1). (*Id.*, Dkt. No. 38.) Then, in February 2025, Plaintiffs' Second Amended Complaint brought new allegations but under the same six causes of action as the prior complaint. (*See generally id.*, Dkt. No. 55.)

Plaintiffs voluntarily dismissed the case on May 23, 2025, four days before Meta's motion to dismiss was due. (*Id.*, Dkt. Nos. 62, 64.)

### B. The Instant Suit

On August 12, 2025, nearly three months after they dismissed the prior suit, Plaintiffs again filed suit against Meta, this time in state court. (Dkt. No. 1-1.) Defendant removed the case roughly two months later, then moved to dismiss Plaintiffs' complaint a week later. (Dkt. Nos. 1, 13.) Defendant's motion argued, among other things, several of Plaintiffs' causes of action did not state a claim because Plaintiffs consented to Meta's Terms of Service, Privacy Policy, and Cookies Policy.

At the hearing on Defendant's motion on May 8, 2026, the Court suggested the parties resolve the issue of whether Plaintiffs consented to Meta's policies through summary judgment, as opposed to judicial notice on a motion to dismiss. (*See, e.g.*, Dkt. No. 40 at 4:9-10.) The Court emphasized it would be more efficient to address consent on a motion for summary judgment

rather than granting a motion to dismiss on the ground Plaintiffs consented to the policies at issue. (*See id.* at 10:21-24 ("I could grant it, and [with] leave to amend, and [Plaintiffs] would amend, and then we'll do another round and we'll be back here six months later[.]")) So, at the Court's suggestion, the parties filed a stipulation regarding the consent issue in which they agreed:

> 1. Plaintiffs A.A. and C.M. consented to the versions of Meta's Terms of Service, Privacy Policy, and Cookies Policy submitted in connection with Meta's Motion (Dkts. 13-7 through 13-18), which Terms and policies were in effect during the time Plaintiffs used Wisp's website, *see* Compl. ¶¶ 8-9 (alleging use of Wisp website between 2022 and 2024).
>
> 2. Plaintiffs intend to seek leave to file an amended complaint to address arguments concerning the issue of consent raised at the May 8, 2026, hearing on Meta's motion.

(Dkt. No. 41 at 3.)

On June 6, 2026, Plaintiffs filed a Motion for Leave to File a First Amended Class Action Complaint (Dkt. No. 43), which Defendant opposed (Dkt. No. 47), and the Court ultimately granted (Dkt. No. 52.) Plaintiffs filed their First Amended Class Action Complaint on July 24, 2026 (Dkt. No. 54). Defendant again moved to dismiss (Dkt. No. 58).

## DISCUSSION

## I. CONSENT

As a threshold matter, Defendant contends all of Plaintiffs' claims fail because Plaintiffs consented to Defendant's receipt of information about their activity on third-party websites, including through code from the Meta Pixel. (Dkt. No. 58 at 16.) "Consideration of consent is appropriate on a motion to dismiss where lack of consent is an element of the claim." *Silver v. Stripe Inc.*, No. 4:20-cv-08196-YGR, 2021 WL 3191752, at *2 (N.D. Cal. July 28, 2021). Here, each of Plaintiffs' three claims depend on consent.

### A. Plaintiffs Must Allege Lack of Consent

As to Plaintiffs' first claim, CIPA Section 632 imposes liability only for recording a confidential communication "without the consent of all parties." Cal. Penal Code § 632(a); *see Rojas v. HSBC Card Servs., Inc.*, 93 Cal. App. 5th 860, 889 (2023) ("[L]ack of consent is a required element under … section 632."); *see also* Cal. Jury Instr., Crim 3010. It is therefore Plaintiffs' burden to plead lack of consent. Plaintiffs similarly cannot allege the "reasonable

expectation of privacy" required to state their second claim of invasion of privacy under the California Constitution, *see In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020), *cert. denied sub nom. Facebook, Inc. v. Davis*, 592 U.S. 1317 (2021), if Defendant's privacy policy, which Plaintiffs agreed to, provided clear notice Defendant tracked Plaintiffs' activity on third-party websites. *Hammerling v. Google, LLC*, No. 22-17024, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (dismissing invasion of privacy claim because Google "expressly disclosed" tracking); *Lloyd v. Facebook*, *Inc.*, No. 23-15318, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024) (same). Finally, as to Plaintiffs' third claim under the Federal Wiretap Act, "consent of one of the parties to the communication [is] sufficient to preclude liability." *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1045 (N.D. Cal. 2014); *see* 18 U.S.C. § 2511(2)(d) (stating no liability exists where "one of the parties to the communication has given prior consent" to interception). So, Plaintiffs bear the burden of plausibly alleging lack of consent for each of their causes of action.

**B. The Record Compels the Inference Plaintiffs Consented**

Consent "can be [express] or implied, but any consent must be actual." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (quoting *In re Google Inc.*, No.13-MD-02430-LHK, 2013 WL 5423918, at *12 (N.D. Cal. Sep. 26, 2013)). "For consent to be actual, the disclosures must 'explicitly notify' users of the conduct at issue." *Id.* (quoting *In re Google Inc.*, 2013 WL 5423918, at *13). "Consent is only effective if the person alleging harm consented 'to the particular conduct, or to substantially the same conduct' and if the alleged tortfeasor did not exceed the scope of that consent." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012). In determining consent, the Court considers "whether the circumstances, considered as a whole, demonstrate that a reasonable person understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Calhoun*, 113 F.4th at 1147 (quoting *Smith v. Facebook, Inc.*, 745 F. App'x 8, 8 (9th Cir. 2018)). If Plaintiffs "could have plausibly understood the disclosures 'as *not* disclosing that [the defendant] would engage in particular conduct,' then the disclosures are insufficient to establish consent." *Id.* (quoting *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 789 (N.D. Cal. 2019)).

Here, Plaintiffs concede they "consented to [Meta's] general Terms of Service, Privacy Policy, and Cookies Policy." (Dkt. No. 54 ¶ 8; Dkt. No. 42.) In relevant part, Meta's Privacy Policy explains:

> We collect and receive information from partners, measurement vendors, marketing vendors and other third parties about a variety of your information and activities on and off our Products.
>
> Here are some examples of information we receive about you:
> - Your device information
> - *Websites you visit and cookie data*, like through Social Plugins or *the Meta Pixel*
> - Apps you use
> - Games you play
> - *Purchases and transactions you make off of our Products using non-Meta checkout experiences*
> - Your demographics, like your education level
> - The ads you see and how you interact with them
> - How you use our partners' products and services, online or in person.
>
> Partners also share information like *your email address, cookies and advertising device ID with us*. This helps us *match your activities with your account*, if you have one.
>
> We receive this information whether or not you're logged in or have an account on our Products.

(Dkt. No. 58-11 at 7) (emphasis added).

Meta's Cookies Policy, referenced in its Privacy Policy, similarly states:

> Our business partners may also choose to share information with Meta from cookies set in their own websites' domains, whether or not you have a Facebook or Instagram account or are logged in. Specifically, cookies named _fbc or _fbp may be set on the domain of the business partner whose site you're visiting. Unlike cookies that are set on Meta's own domains, these cookies aren't accessible by Meta when you're on a site other than the one on which they were set, including when you are on one of our domains. They serve the same purposes as cookies set in Meta's own domain, which are to personalize content (including ads), measure ads, produce analytics and provide a safer experience, as set out in this Cookies Policy

(Dkt. No. 58-16 at 10.)

The Cookies Policy further explains businesses may use tools such as "Meta Pixel" to share information about the user's "interactions with them"; Meta "receive[s] identifiers" through cookies when users visit websites that "incorporate Meta technologies" such as Meta Pixel; and

Meta uses the information to "deliver ads to people who have previously visited a business's website [or] purchased its products." (*Id.* at 2, 6, 11.)

Plaintiffs allege they "purchased" medications from Wisp (Dkt. No. 54 ¶ 10); Wisp shared Plaintiffs' purchase "events" with Meta using Pixel code (*Id.* ¶¶ 42, 48-50); certain identifiers were also sent via "cookies" (*Id.* ¶¶ 56-65); Meta "link[ed]" the information to "corresponding Facebook profiles" (*Id.* ¶ 65); and this ultimately caused Plaintiffs to receive "targeted" advertisements (*Id.* ¶ 84). Plaintiffs contend they state a claim because Meta's conduct exceeded the scope of their admitted consent. The Court is unpersuaded.

**1. Prescription Medication Purchases**

Plaintiffs' prescription medication purchases fall squarely within the Privacy Policy's plain and unambiguous language: Meta collects information regarding the purchases and transactions users make on non-Meta websites. The Policy contains no exception for *health-related* purchase information. And courts "cannot insert language [into a contract] that one party now wishes were there." *Dameron Hosp. Ass'n v. AAA N. Cal., Nev. & Utah Ins. Exch.*, 229 Cal. App. 4th 549, 569 (2014). Applying California contract law, as the Court must, the disclosure Meta will "collect and receive information from … third parties" including "[p]urchases and transactions [users] make" notified Plaintiffs that information regarding *all* purchase and transactions made using Meta products, such as Meta Pixel, on non-Meta websites, may be collected and received. (Dkt. No. 58-11 at 7); *See Rojas*, 93 Cal. App. 5th at 888-89 (affirming finding of implied consent to the recording of confidential personal calls because the disclosure that phone calls "may be recorded … warn[ed] *all* calls may be recorded, regardless of content.").

Courts have repeatedly concluded similar language in other privacy policies was sufficient to give clear notice of and/or establish consent to third-party data collection on other websites. *See, e.g.*, *Smith*, 875 F. App'x at 8-9; *Lloyd*, 2024 WL 3325389, at *2; *Hammerling*, 2024 WL 937247, at *3; *In re: Google Cloud Contact Center AI Privacy Litigation*, No. 23-CV-05437-RFL, 2026 WL 3189502, at *2-3 (N.D. Cal. Oct. 22, 2026). In *Smith*, for example, the Ninth Circuit concluded a "reasonable person" viewing substantially similar disclosures from Facebook "would understand that Facebook maintains the practices of (a) collecting its users' data from third-party

United States District Court
Northern District of California

sites and (b) later using the data for advertising purposes." 745 F. App'x at 8-9. Based on this understanding, the court held plaintiffs had consented to "collect[ion] and us[e] [of] their browsing data from various healthcare-related websites" and affirmed dismissal of CIPA and privacy claims. *Id.* at 8. The court rejected the plaintiffs' claim their general consent to Facebook's data tracking and collection practices did not extend to the collection of health-related data merely due to its "qualitatively different" and "sensitive" nature. *Id.* at 9.

Moreover, Plaintiffs do not identify any language in the Privacy or Cookies Policy that could plausibly mislead a reasonable user into believing health-related purchase and transaction information would *not* be collected and received. This case is therefore distinguishable from cases like *Calhoun*, in which the defendant had "service-specific privacy policies that could reasonably be read to say the opposite of what its general privacy policies disclosed." 113 F.4th at 1147-49 (remanding the issue of consent to the district court for trial where "explicit statements in [Google's] Chrome Privacy Notice would actually give a reasonable user the *opposite* impression regarding Google's data collection practices …. [and Google's Privacy] Policy also contained statements in favor of [p]laintiffs' interpretation"); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 602 (holding a reasonable user would *not* have expected Facebook would access their data after logging out of the site due to affirmative disclosures in Facebook's Data Use Policy stating logged-out user data would *not* be collected."). Because Meta's policies "explicitly notif[ied]" Plaintiffs of the particular conduct at issue without exception or contradiction, Plaintiffs' consent was "actual." *Calhoun*, 113 F.4th at 1147.

Plaintiffs' reliance on other district court cases declining to find consent to the collection of health-related information is unpersuasive. Each case involved policy language regarding the tracking of "data" generally. *See, e.g.*, *Rusow v. Skinspirit Essential LLC*, No. 24-CV-09317-CRB, 2025 WL 4657637, at *9 (N.D. Cal. Oct. 15, 2025) (policy disclosing "[w]e use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s)"); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793-94 (N.D. Cal. 2022) (policies disclosing Meta "collect[s] and use[s] your personal data", third-parties partnered with Meta "provide information about your activities off of our Products" and Meta's "business

partners may also choose to share information with Meta"); *Doe v. Microsoft Corp.*, No. 2:23-cv-00718-JCC, 2023 WL 8780879, at *6 (W.D. Wash. Dec.19, 2023) (policy disclosing health care provider would share "'your personal information to third parties who provide services on our behalf to help with our business activities,' and that Kaiser and its 'service providers may place Internet 'cookies' or similar technologies ... on the computer hard drives of visitors to the Site.'").

Here, in contrast, the Privacy Policy specifically and unambiguously discloses Meta will collect purchase and transaction information. The disclosure thus "explicitly notifies" users of the collection practice at issue. *See Doe v. Microsoft Corp.*, No. C23-0718-JCC, 2023 WL 8780879, at *6 (W.D. Wash. Dec. 19, 2023). And there is only one plausible interpretation of that disclosure: Meta may collect all purchase and transaction data from third-party websites that use Meta products, such as Meta Pixel. Plaintiffs could not have plausibly understood Meta's disclosure as "*not* disclosing that [Meta] would engage in" the tracking of purchases and transactions of prescription medication on Wisp.[3] *Calhoun*, 113 F.4th at 1147 (citing *In re Facebook*, 402 F. Supp. at 789). Accordingly, drawing all reasonable inferences in Plaintiffs' favor, Meta's disclosures establish consent as to this conduct as a matter of law.

### 2. Page Views and Other Information

Plaintiffs' new allegations about transmission of "page views" and other comparable information also falls within Meta's disclosures. Specifically, Plaintiffs allege Meta "capture[d] a range of 'events' as a patient browsed the [Wisp] Website, registered as a customer, and obtained treatment" including "PageView" and "ViewContent" events that occurred "well before, and independent of, any purchase." (Dkt. No. 54 ¶ 52.) Per Meta's specifications, the "ViewContent" event "tells you if someone visits a web page's URL, but not what they do or see on that web page," and "PageView" "tells you when someone lands on a web page." (Dkt. No. 58-6 at 3.) This information falls directly within either or both of Meta's disclosures regarding its acquisition of "purchase information" and its broader disclosures Meta receives "information" from "third

[3] Additionally, unlike the data in *In re Meta Pixel Healthcare Litig.*, Plaintiffs' purchases of prescription medications on the Wisp website does not constitute "protected health information from a [HIPAA-covered] medical provider." 647 F. Supp. 3d at 793-94.

parties" about "information and activities … off [Meta's] products," including "[w]ebsites you visit." (Dkt. No. 58-11 at 7); *see Smith*, 745 F. App'x at 8-9 (concluding materially identical disclosures established consent for Meta to receive "browsing data from various healthcare-related websites.").

To the extent Plaintiffs allege Defendant "intercepted and recorded information [on the Wisp Website] revealing the reproductive- and sexual-health conditions a patient was discussing with their healthcare provider, regardless of whether the patient ultimately made a purchase or scheduled an appointment" including information about "appointments" and "symptoms quizzes," Plaintiffs fail to allege facts sufficient to plausibly support an inference any particular information about Plaintiffs was actually transmitted to Meta or even *could* be transmitted to Meta. (Dkt. No. 54 ¶ 54.) Notably, neither Plaintiff alleges she completed a "symptoms quiz." And Plaintiff C.M., who alleges she made appointments on the Wisp Website, does not allege what information about her appointments was transmitted to *Meta* beyond the fact that an appointment was scheduled. Accordingly, Plaintiffs fail to state a claim based on these new conclusory allegations. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (confirming a court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."). And even if Plaintiffs had pleaded more specific factual allegations, Meta's policies broadly disclosed it would receive information, including about medical conditions and treatments, from this type of web browsing and purchasing activity. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 956 (N.D. Cal. 2017) (citation omitted), *aff'd*, 745 F. App'x at 8 (9th Cir. 2018).

**3. Plaintiffs' Other Arguments**

Plaintiffs separately suggest Meta could not have gained their consent because Wisp's privacy policy "represented that Wisp would protect the confidentiality of users' health information consistent with applicable law, that Wisp would use users' [personal health information] only for purposes of treatment, payment, and healthcare operations, and that Wisp does not sell users' personal information for monetary or other valuable consideration." (Dkt. No. 54 ¶ 31-32.) But Wisp's representations regarding their own privacy policies do not displace



United States District Court
Northern District of California

Meta's Privacy Policy or Cookies Policy, which Plaintiffs affirmatively consented to, and which did not make such assurances. *See Smith*, 745 F. App'x at 9 ("Facebook's Terms and Policies make no such assurance, and Facebook is not bound by promises it did not make."). This principle applies with equal force to Meta's Business Tools Terms, which prohibit businesses using Meta's Pixel code from sending health information to Meta. (Dkt. No. 58-19 at 2.) These terms are directed exclusively to third-party developers like Wisp, *not* Facebook users like Plaintiffs, and also make no promise to users that such information will not still be received by Meta. Because Meta's Business Tools Terms involve an entirely separate contract between Meta and third-party developers, which Meta users are not party to, those terms do not vitiate Plaintiffs' established consent to Meta's user-facing privacy policies.

Plaintiffs finally contend they did not consent to Meta's conduct because they did not reasonably expect their activity on Wisp's website would be sent to Meta since the information at issue is allegedly "protected under the both the California Consumer Privacy Act (CCPA) and the Confidentiality of Medical Information Act (CMIA)." (Dkt. No. 54 ¶ 90.) Here again, Plaintiffs cannot rely on a third party's representations, in this case *Wisp*'s alleged failure to comply with CCPA and CMIA requirements, to argue *Meta* failed to obtain consent. *See Smith*, 745 F. App'x at 9. Nor can Plaintiffs "bootstrap" CCPA and CMIA notice requirements onto their common-law privacy claims. *See Rodriguez v. Accident Fund Holdings, Inc.*, No. 2:25-cv-03920-SK, 2026 WL 2365062, at *4 (C.D. Cal. Aug. 13, 2026).

Because drawing all reasonable inferences in Plaintiffs' favor, they have not plausibly alleged lack of consent, their claims are dismissed.

## II. LEAVE TO AMEND

The Court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ..., [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892-93 (9th Cir. 2010) (*quoting Foman v. Davis*, 371 U.S. 178, 182 (1962)) (alterations in original). Plaintiffs have now had five opportunities to file a complaint with plausible claims, and consistently "fail[ed] to cure

deficiencies by amendments previously allowed." The Court is not persuaded any amendment can change the undisputed fact that Plaintiffs consented to the precise conduct at issue in the case. Because no further allegations could "allow Plaintiffs to bring claims arising out conduct which they consented to," amendment would be futile. *Smith*, 262 F. Supp. 3d at 956; *see also Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 725-26 (9th Cir. 2000) ("a district court acts within its discretion to deny leave to amend when amendment would be futile"). So, the Court will dismiss the complaint without leave to amend.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's motion to dismiss the FAC with prejudice and without leave to amend.

This Order disposes of Docket Nos. 58, 59.

**IT IS SO ORDERED.**

Dated: November 13, 2026

JACQUELINE SCOTT CORLEY
United States District Judge